## BOB HISAW v. STATE.

No. A12461.   Opinion Filed June 9, 1917.

(165 Pac. 636.)

1. **PROSECUTING ATTORNEYS—Special County Attorney—Power of District Court.** The district court has authority to appoint a special county attorney to act in the place and stead of the regular elected county attorney where the latter is disqualified in any particular case. Aside from any statute, this power is inherent in a court of general jurisdiction.

2. **SAME—Appointment of Special County Attorney—Ratification.** Where the regular county attorney is disqualified and a special county attorney is appointed by the regular district judge at his chambers in vacation, and said appointee thereafter qualifies according to law, and his appointment is recorded in the court's criminal journal as a part of the proceedings in the particular case for which the appointment was made, and upon the trial the same judge over objection of the defendant recognizes the appointment made in vacation, and permits said special county attorney to proceed as the representative of the state in such case, there is a ratification by the court of the said appointment, which is tantamount to an appointment by the court in the first instance, where no other objection is urged except that the district judge was unauthorized to appoint in vacation.

3. **INDICTMENT AND INFORMATION—Setting Aside Indictment —Grounds—Examination of Witnesses.** The grounds upon which a criminal action may be dismissed or an indictment set aside are clearly enumerated in the Code. The fact that the county attorney or his substitute, after the finding of the indictment and prior to the trial, examines certain witnesses under oath in the

absence of the accused and with the approval of the county judge is no ground for dismissing an action or setting aside an indictment.

4. **INDICTMENT AND INFORMATION—Indorsement of Names of Witnesses—Service of List of Witnesses.** Subdivision 2 of section 1, c. 68, Session Laws 1913, permits the county attorney, on approval of the district or county judge where a felony case is pending against any person triable in that county, to call witnesses before him and have them sworn and their testimony reduced to writing at the cost of the county. The names of witnesses thus obtained should be properly indorsed upon the indictment and information, and in capital cases a list of those who are to be used in chief, together with their respective post office addresses, must be served upon the defendant at least two days before the case is called for trial.

5. **JURY—Summons Upon Second Venire—Challenge to Panel.** The fact that, after a challenge to a panel had been sustained on account of the bias and prejudice of the sheriff whose deputies summoned the jurors, some of the persons composing it were summoned on a second venire by an unbiased and unprejudiced officer, is no ground for challenge to the second panel.

6. **SAME—Second Panel—Fair and Impartial Jury.** Where it is not made to appear that the defendant challenged any of such jurors individually for cause, or that he was required to exercise a peremptory challenge to any of them by reason of which his peremptory challenges were exhausted, this court cannot hold that a fair and impartial jury was not afforded in the trial, or that defendant's substantial rights were invaded by reason of the trial court permitting the names of such jurors to be placed in the trial box over his objection.

7. **TRIAL—Instruction—Accomplice Testimony.** Where the facts are not disputed, and there is no evidence to show that any witness for the state is an accomplice, there is no error in refusing to give an instruction upon the necessity of corroborating an accomplice.

8. **TRIAL—Instruction—Province of Jury.** Defendant requested the following instruction: "You are instructed that if during the course of this trial any evidence has been offered which is capable of two constructions, one favorable to the defendant and one unfavorable, that it will be your duty to give to such evidence the construction most favorable to the defendant." **Held,** properly refused as invading the province of the jury in that it tended to deprive the jury of the right to determine the weight of the evidence and the inferences properly to be drawn therefrom.

9. **APPEAL AND ERROR—Brief—Evidence.** Where it is contended that incompetent evidence has been admitted over the objection

and exception of the defendant, the brief must not only contain a statement of the evidence complained of, but counsel must also support their assignment of error with some argument and authority to convince this court that the defendant has been prejudiced by the trial court's rulings.

10. **APPEAL AND ERROR**—Remarks of Trial Judge—Reversal. Record examined, and **held**, remarks of trial judge were not such as to authorize a reversal of this judgment.

*Appeal from District Court, Haskell County;*
*W. H. Brown, Judge.*

Bob Hisaw was convicted of murder and sentenced to imprisonment for life, and appeals. Affirmed.

On the 13th of February, 1912, Virgil (commonly called Rex) Ray and his wife, Lizzie Ray, who had been married about a month previous to that date, separated. They had been living in a little one-room log house in the Hisaw neighborhood of Haskell county. Rex Ray was a tenant farmer, and prior to his marriage and up to the time of said separation had off and on worked for the defendant Bob Hisaw; the defendant being a farmer and stock raiser of that neighborhood. On the afternoon of February 13, 1912, Rex Ray and his wife and her father, Dick Odom, hauled what little household goods the Rays had up to old man Dick Odom's place. It was there that Rex Ray and his wife finally parted—Rex leaving there with a man by the name of Dink Dukes, another farm hand who had been working in that neighborhood, and when they left they said they were going across the river; this community being in the neighborhood of both the Canadian and Arkansas rivers near the junction of them. The general public never saw Rex Ray alive after dark of February 13, 1912. He was missed from that community. Along in April or May of that year it became rumored that Rex Ray had been killed and his body buried. On

the 28th day of June, 1912, Dink Dukes appeared in Stigler, the county seat of Haskell county, and informed the officers that Rex Ray had been killed on the night of February 13, 1912, and his body buried near the Arkansas river in what was known as the Hisaw bottoms, and that Bob Hisaw had shot and killed Rex Ray while he was asleep in bed at the home of one Rile Odom, a brother of Ray's wife, and that Bill Hisaw came with Bob Hisaw when the killing occurred. Dink Dukes also stated that he could go with the officers and find the place where Rex Ray's body had been buried. A complaint charging Bob Hisaw and Bill Hisaw with the murder of Rex Ray was immediately filed by the county attorney of Haskell county, and warrants issued for their arrest. The officers carried these warrants with them when they went down with Dink Dukes to disinter Ray's body. On their way they stopped at the home of Bob Hisaw, but could not find either him or Bill. There had been a picnic in Stigler on that day, which Bill Hisaw had attended. As soon as he heard that Dink Dukes had disclosed that Rex Ray had been murdered, and that the officers had gone to the scene to search for the body, he got a horse and immediately rode to Bob Hisaw's house, where he had been staying. The officers disinterred Ray's body, and found it wrapped in a blanket and quilt, dressed in a dark coat, an old blue shirt, either one or two pairs of trousers, and one pair of overalls. The flesh was partially decomposed, but a bullet hole was discovered in the head near the nose. These parties did not make a thorough investigation of the body because of its badly decomposed condition. The officers returned to Stigler, and thereupon Rile Odom and his wife, Mary Odom, were arrested in connection with Dink Dukes as being implicated in the

murder. About a week or ten days later Bill Hisaw came to Stigler and gave himself up. A month or two thereafter he was tried for the murder and acquitted. Bob Hisaw was not arrested until about October, 1914, when he was captured in McCurtain county, Okla., on a farm about ten miles from the town of Valiant. He was at that time going under the name of R. A. Johnson. The trial of Bob Hisaw took place in December, 1914. Bill Hisaw, Rile Odom, Mary Odom, his wife, Emma Hisaw *nee* Odom, Lizzie Ray, *nee* Odom, the widow of Rex Ray, and the old lady Odom, the mother, were all witnesses for the prosecution, and testified to a state of facts substantially as follows:

That Rex Ray separated from Lizzie Ray on the 13th of February, 1912, at old man Dick Odom's house, and left traveling afoot with one Dink Dukes. That he was dressed at that time in a dark coat, an old blue shirt, and a pair of overalls over a couple of pairs of trousers, and was wearing ordinary work shoes. Rile Odom says that he was at his father's house that day and learned of the separation of Rex Ray from his (Odom's) sister, and that along in the afternoon he started home riding horseback. That on his way home he overtook Rex Ray and Dink Dukes, and that they told him they were leaving the country, and were going across the river if they could find some place to ford that night. Odom says that he told them if they couldn't get across the river that night to come and stay all night at his house and wait until next morning and go across. That he separated from them near the Hisaw store and postoffice, their intention being to ford the river, and his to return home. He says that about an hour, or near that time, after he returned home, Rex Ray and Dink Dukes appeared at his house, stating that they could

not find a way to ford the river that night. That Odom lived in a small two-room log house not far from the west bank of the Arkansas river. That they all went to bed in one room; Rex Ray and Dink Dukes and Rile Odom sleeping in one bed, Rile's wife, Mary, and her two children sleeping on another bed, and Emma Odom sleeping on a pallet close to these beds. They state: That about 12 o'clock that night somebody came to the front of their house and halloed, "Hello!" That Rile Odom lighted a lamp and opened the door. That Bob Hisaw and Bill Hisaw came into the room. That as soon as he came in Bob stated, "There is going to be hell here in a few minutes." Rile says that he told Bob that he didn't want any hell there that night. That Bob immediately walked over to the bed in which Dink Dukes and Rex Ray were lying, turned the covers back, and with the remark to Rex Ray, "Wake up, old boy!" commenced to shoot him in the breast with loads from a pistol. That Bob Hisaw shot Rex Ray five times in the breast, and then stepped back from the bed toward the fireplace, remarking in substance, "Now, I guess you will burn my barn, and poison my horses, and sneak up behind me and cut my throat, and take me away from my little children," to which Rex Ray is alleged to have replied, "No, no, Bob," whereupon Bob said, "Well, I guess you need another," and reloaded his pistol, stepped back to the bed, and fired another load into Ray's head. The witnesses then say that Bob turned around to each of them with his drawn pistol, stating that if they said anything about it they would go the same way. That he then directed Dink Dukes and Bill Hisaw and Rile Odom to help him put Ray's clothes on, which was done, and the body wrapped in a blanket and quilt, carried out and placed on a horse which Bob Hisaw led and Dink Dukes

rode, holding the body in front of him across the horse, and Bill Hisaw walked beside the horse out to a field about 200 or 300 yards from Rile Odom's house, where the body was thrown into a gap and covered up with brush. Just when and by whom the body was buried does not appear from the record. Rile Odom did not accompany the parties away from the house. Some time after these parties left with the body of Rex Ray they again appeared at Rile Odom's house and washed their hands, stood around and talked, and finally Bill Hisaw and Bob Hisaw and Dink Dukes left. The next morning Rile Odom and his wife and children and Emma Odom all went up to old man Dick Odom's house. They stayed around there two or three days, and afterwards moved to a little house on Bob Hisaw's place, about a quarter of a mile from where he lived, and were still living there at the time of their arrest on the 28th day of June, 1912. Dink Dukes stayed around in that neighborhood for a while, and then disappeared. Bill Hisaw stayed on the farm there with Bob up until the day that Ray's remains were disinterred. Bob Hisaw also stayed there until that time. Old man Odom and his wife and Lizzie Ray testify that on the night of the 13th of February, 1912, Bob Hisaw and Bill Hisaw came to their house; that Bob asked if Rex Ray was there, and was told that he had left that evening; that Bob was drinking, and had some whisky with him, and offered them a drink of whisky, and then left. This was about an hour before he is said to have appeared at Rile Odom's house. Dick Odom and Rile Odom lived about four miles apart. There is some evidence in the record to the effect that Bob Hisaw and Rex Ray had had some trouble over a hog which either Bob had lost or it had been stolen, and there is evidence to the

effect that Rex Ray had made threats against Bob Hisaw just a short time before the homicide to the effect that there would be trouble between him and Bob if Bob came over to Rile Odom's to a dance that Rile intended to have, and danced with his (Rex Ray's) wife. It appears that Bob Hisaw and Rex's wife had been neighbors and friends ever since they were boys and girls together. There is also some evidence to the effect that Rex Ray had been married previous to his marriage to Lizzie Odom, and that his first wife had died mysteriously, and that Rex Ray was tried for killing her. This evidence, we presume, was admitted for the purpose of indicating that Lizzie Ray was afraid that Rex would kill her, and that she instigated her brothers and his friends to kill Rex and bury him. On the other hand, the theory of the state is that there was hard feeling between Bob Hisaw and Rex Ray, and that Rex had indicated that he intended to do Bob some injury, both to his person and his property, and that Bob was infuriated thereby, and on this occasion was drinking, and concluded he would put Rex out of the way in order to prevent any future trouble. The jury adopted the latter theory of the killing, and there is ample evidence in the record to support the conviction.

The defense relied upon was an alibi, Bob Hisaw testifying that he was at home from a little after dark on the evening of the 13th of February, 1912, all the balance of the night, and that he sat up with a sick child of his until after midnight, and that his wife and Hiram Thomas and Jeff Rainwater, his cousin, and Idus George were all at his house that night sitting up with the sick child. He is corroborated by all of these witnesses, who were shown to be either relatives or very intimate friends of his, at

whose places and with whom he counseled and conversed during the time he was scouting from the 28th day of June, 1912, up until October, 1914. Bob explains the fact that he went on the scout by stating that he had heard that the Odoms were going to testify that he killed Rex Ray, and that he did not know just when they would say it was done, and ran off until he could find out what their testimony would be. It appears, however, that after Bill Hisaw was tried and acquitted and the testimony of all these state witnesses became public, even after that time Bob returned to near the scene of the homicide and counseled and advised with those people who afterwards corroborated him in his alleged alibi. This was either late in the year 1912 or early in the year 1913, and yet after all that happened Bob again went on the scout and stayed for a period of over a year, and never did surrender himself to the officers.

A. L. Beckett, R. C. Roland, and E. O. Clark, for plaintiff in error.

S. P. Freeling, Atty. Gen., and R. McMillan, Asst. Atty. Gen., for the State.

MATSON, J. (after stating the facts as above). The regularly elected county attorney being disqualified by reason of having been employed by the defendant as counsel in his defense, prior to his election to the office of county attorney, the regular district judge of the district while holding court in another county in the district appointed Mr. Guy A. Curry, an attorney of the Haskell county bar, as special prosecuting attorney in this case. This appointment was made some two years after the return of the indictment; the special prosecutor being

appointed merely for the purpose of preparing the state's case for, and conducting, the trial.

The counsel for defendant filed numerous motions and took various exceptions, all based upon the action of the district judge in appointing a special county attorney while not in open court in Haskell county. It is contended that our statutes require that a special or substitute county attorney must be appointed by the court, and that an appointment by the presiding judge in vacation is void, and all subsequent proceedings conducted by such an appointed special county attorney are an absolute nullity. Counsel cite the case of *Dodd v. State,* 5 Okla. Cr. 513, 115 Pac. 632, in support of their contention that this appointment was void. However, in the Dodd Case the special county attorney was appointed by a district judge who had, prior to the appointment, become disqualified, and the special county attorney himself failed to properly qualify according to the laws of this state.

In this case it is nowhere contended that the district judge making the appointment was disqualified to act, or that the special county attorney failed to take the required oath of office before acting. On the contrary, it is made to appear affirmatively that the district judge was qualified to make the appointment, and that before taking any action in the case the special county attorney properly qualified.

The sole contention in this case is that the appointment was void because not made in open court and the order entered upon the minutes. Section 1558, Rev. Laws 1910, provides:

"The district court, whenever there shall be no county attorney for the county, or when the county attorney shall be absent from the court, or unable to attend to his duties, or disqualified to act, may apoint, by an order to be entered in the minutes of the court, some suitable person to perform for the time being the duties required by law to be performed by the county attorney, and the person so appointed shall thereupon be vested with all the powers of such county attorney for that purpose. Such attorney shall be paid a reasonable compensation for his services by the county for which he is so appointed."

The foregoing statute was intended to give the district court the power and authority to appoint temporarily a county attorney to act in the place and stead of the regular county attorney under the circumstances enumerated in the statute. Prior to the adoption of the Rev. Laws 1910 the words "or disqualified to act" were not contained in this statute. They were inserted by the codifiers of that Code. Independent of the statute, however, the court would have the inherent power to appoint a special county attorney under any of the circumstances therein enumerated. It is essential to the very life of the court that the proper officers be in attendance upon it. The power to appoint such officers is necessary for the protection and existence of the court and absolutely essential to the administration of justice and the enforcement of all our laws. It would be an indefensible reproach upon our institutions if crimes should go unpunished and the public business remained unattended to for want of power in a court of general jurisdiction to appoint some one to supply the place of the regular elected officer when absent from court or disqualified to act. The courts of this state are not powerless to this extent. They have the right and power to preserve their life, and the machinery of

the court cannot be kept in motion without its proper officers. It is therefore an inherent power of the presiding judge of the court to supply these officers when there is a temporary vacancy or a disqualification in any particular case. We conceive it our duty therefore to give the foregoing statute a broad, practical, and common-sense construction in order to carry into effect the purposes for which it was enacted, and to give expression to this inherent power of courts of general jurisdiction in this state. We admit that it was intended that the special county attorney should be appointed by the court; but should an irregularity in the appointment destroy its effect and render void all the acts of this special officer where it appears conclusively from the record that with the knowledge and consent of the court the officer proceeded to his duty? In this case, while the original appointment was made by the judge in vacation, yet when the case was called for trial, and objection made to that appointment, the judge in open court before proceeding to the trial of this case announced that the appointment had been made by him, and permitted the special county attorney thus appointed to proceed as the representative of the state in this action. It is admitted also by counsel for the defendant that the regular county attorney was disqualified in this case; that the special county attorney who represented the state was qualified to act, and the very judge who made the appointment in vacation presided at the trial. It is our opinion, therefore, that the action of the trial judge in permitting the special county attorney to act under these circumstances amounted in itself to an appointment made by the court, and was a specific ratification by the court of everything that the presiding judge had done in vacation and at his cham-

bers. The purpose of having the appointment made by the court is to permit a judicial determination of the fact that some ground exists under the statute which permits an appointment to be made. That such a ground did exist clearly appears from the record of the trial and proceedings in this case. The purpose of having the order of appointment noted in the minutes of the court· is to supply a record thereof, and in our opinion it is a substantial compliance with that provision of the statute if the order of appointment be recorded on the journal of the court and made a part of the proceedings of the case, as was done in this instance. In the case of *State v. Duncan*, 116 Mo. 288, 22 S. W. 699, it was held:

"Where there was no prosecuting officer in attendance on the trial, the court had the power, aside from Revised Statutes 1889, sec. 643, to appoint a temporary representative of the state; and the fact that, in the absence of the circuit attorney, the trial court permitted another to represent him, was tantamount to an appointment."

And again, section 5908, Rev. Laws 1910, provides:

"If the county attorney fails, or is unable to attend at the trial, or is disqualified, the court must appoint some attorney at law to perform the duties of the county attorney on such trial."

The latter statute permits the court to appoint a special county attorney for the trial of any particular case where the regular county attorney is disqualified. These statutes are merely expressive of the inherent powers of a court of general jurisdiction, and when it is made to appear, as it does in this case, that a contingency arose under which it was proper for the court to appoint a substitute for the county attorney, although

the appointment be made in vacation, if afterwards in open court the same judge recognizes the appointment and permits a qualified person to act upon the trial in the place and stead of the disqualified county attorney, there has been a sufficient compliance with the statutory requirements to validate said appointment.

It is also contended that the court erred in denying the motion to dismiss the action because the special county attorney held a court of inquiry in which certain of the witnesses for the state were examined under oath relative to the commission of this offense. Counsel for appellant have cited us to no statute which makes such action a ground for dismissing a criminal action or setting aside an indictment. The grounds upon which an action may be dismissed and an indictment set aside are clearly set out in the statute, and the fact that the county attorney or his substitute examines certain witnesses under oath in the absence of the defendant is not among the grounds eumerated therein. Subdivision 2 of section 1 of chapter 68 of the Session Laws of 1913 permits the county attorney,

"on approval of the county judge or district judge, [to] issue subpoenas in felony cases and call witnesses before him and have them sworn and their testimony reduced to writing and signed by the witnesses at the cost of the county. Such examination must be confined to some felony committed against the statutes of the state and triable in that county, and the evidence so taken shall not be receivable in any civil proceedings."

We are not concerned with the wisdom or policy of this statute. That was a matter for the Legislature to determine, and, having determined that such examinations were necessary in felony cases, it becomes only the prov-

ince of this court to construe such statute and pass upon its constitutionality if questioned. In this case it is not contended that the statute is unconstitutional, but only that the county attorney is powerless to hold such an examination in the absence of the defendant, or his counsel, and that his action in so doing is prejudicial to the substantial rights of the defendant in that it has a tendency to intimidate the witnesses thus examined and compel them to testify to facts to which they otherwise would not testify. We cannot appreciate the logic of the reasoning that such an examination would be prejudicial to the substantial rights of a defendant. Upon the trial of a criminal case defendant has a constitutional right to be confronted with the witnesses against him, but prior to the trial the Legislature has the power to provide for the discovery of evidence showing the commission of crime. Neither the defendant nor his counsel has the right to be present at a grand jury investigation. It ofttimes happens that after an indictment has been returned, or a preliminary examination into a felony has been had, the county attorney hears of other evidence which, if true, would be valuable in the trial of the case, and for the purpose of permitting the county attorney, in cases where such reports come to him, to examine the witnesses who are supposed to have knowledge of these facts, it is essential to the administration of justice, and the Legislature has seen fit so to provide, that when the district or county judge approves thereof, those witnesses may be examined under oath and at the expense of the county. In a capital case it is essential that the county attorney indorse the names of these witnesses upon the indictment or information and serve a list of them with their respective post office addresses upon the defendant at least two days before the

case is called for trial. The defendant, therefore, is provided with a means by which he may be informed as to what witnesses will be used by the state, and in that way have opportunity to determine what their testimony will likely be. This is a privilege that is accorded him by the Constitution, and there was full compliance with that provision in this case. The defendant upon the trial had the right to be confronted with these witnesses who were thus examined in his absence. He had the right to fully cross-examine them as to anything that happened at the proceeding wherein the county attorney had examined them, under oath, and if they had been intimidated or compelled by the county attorney to make disclosures which were not true, or if any undue influence had been exerted upon them at such examination, those matters were proper to be elicited upon the examination at the trial. The objection here interposed, therefore, in our opinion, is directed more to the credibility of witnesses thus obtained, and does not contravene any of the constitutional or statutory rights of the defendant. The court did not err, therefore, in overruling the motion to dismiss the action and set aside the indictment on this ground.

Other alleged errors are assigned as causes for reversal, based upon the invalidity of the appointment of the special county attorney, but in view of what we have heretofore said it is unnecessary to discuss these assignments.

The regular panel of jurors being insufficient from which to select a jury to try this case, the court issued an open venire, directed to the sheriff, for 25 qualified men, to be selected from the body of the county. The defendant contended that these jurors should have been drawn from

the regular jury box.   This contention is without merit, for the statute specifically provides that:

Under circumstances such as these "the jury may be completed from talesmen, or the court may direct that an open venire be issued to the sheriff or other suitable person, for such number of jurors as may be deemed necessary, to be selected from the body of the county, or from such portion of the county as the court may order." (Section 3606, Rev. Laws 1910.)

However, when the special panel of jurors summoned by the sheriff were returned into court, counsel for the defendant moved to quash the panel, upon the ground that the sheriff was disqualified to act, being a probable witness for the state in the case and having offered a reward for the apprehension of the defendant.   The court sustained this motion.   Thereupon it was agreed between counsel for the defendant and the special county attorney that Mr. Neil B. Gardner should be appointed as a special officer to bring in another jury.   The court appointed Mr. Gardner, and he took the required oath in the presence of the court, and received instructions from the court.   Mr. Gardner was to serve an open venire of 30 names, and summoned as a part of the panel 18 of the jurors who had previously been summoned by the sheriff. There was no collusion between the sheriff and Mr. Gardner in summoning these particular jurors.   The record discloses that Mr. Gardner summoned them without any knowledge that they had theretofore been summoned by the sheriff, without any directions from the sheriff or any other person to summon those particular persons, but that they were mostly farmers living in various parts of the county, some of whom he met upon the streets and some around the courthouse; that in addition to these

men he went out over the county and summoned 12 more qualified men. The record also shows that Mr. Gardner made no improper remarks to any of these jurors at the time they were summoned.

Counsel for the defendant interposed a motion to quash the entire panel summoned by Mr. Gardner, which motion was by the court overruled, and thereupon counsel objected to the placing of the names of these 18 jurors, who had previously been summoned by the sheriff, in the jury box for the trial of this case. This motion was also overruled by the court and exceptions taken by counsel for defendant. Both the refusal to quash this second panel and the action of the court in permitting the names of these 18 jurors to be placed in the box are alleged as grounds for reversal of this judgment. In our opinion, these contentions are without merit. It is not ground for quashing the entire panel that some of the jurors on the panel had been previously served by an officer held to be disqualified to act. When brought into court on this panel they were served by a qualified officer, and one whom both the state and the defendant had agreed upon. The entire panel may only be quashed when it is served by an officer who is disqualified within the meaning of section 5848, Rev. Laws 1910, which provides:

"When the panel is formed from persons whose names are not drawn as jurors, a challenge may be taken to the panel on account of any bias of the officer who summoned them, which would be good ground of challenge to a juror. Such challenge must be made in the same form, and determined in the same manner as if made to a juror."

Was it error, however, for the trial court to permit the names of these jurors to be placed in the box and

used upon the trial? Was the action of the court in so doing prejudicial to the substantial rights of the defendant? None of the conditions which were shown to exist in the cases of *Harjo v. State*, 1 Okla. Cr. 590, 98 Pac. 1021, 20 L. R. A. (N. S.) 1013, and *Schuford v. State*, 4 Okla. Cr. 513, 113 Pac. 211, are shown to exist in this case. In the Harjo Case it was shown that the officer who summoned the talesmen did not act impartially, but would only select those whom he thought were favorable to the prosecution. In the Schuford Case, after the sheriff was disqualified the special officer summoned the very jurors that the sheriff had theretofore summoned, and this was done by express direction from the sheriff. This, of course, was practically a resummoning of the same jury by the sheriff. Not so in this case. These 18 men who were summoned by the special officer were summoned by him without any direction from the sheriff, or without any knowledge on the part of the sheriff that they were being summoned a second time, and without knowledge by the special officer that the sheriff had previously summoned any of them. If they were disqualified it was not because of any improper conduct on the part of the officer in summoning them. In our opinion, they stood upon the same basis as any other member of this special panel that was brought in by a qualified officer. If defendant had any legal ground for challenge it was to the individual jurors, and not to the panel, and after these names were permitted to be placed in the box it was the duty of counsel for defendant to challenge them as individuals. This was not done. Therefore any objection to these individual jurors on the ground that they had previously been served by a disqualified officer was waived. In the case of *People v. Vincent*, 95 Cal. 425, 30 Pac. 581, the only

instance in which, after a diligent search, we can find
the exact question here passed upon was ever decided, it
was held:

"The fact that, after a challenge to a panel had been
sustained on the ground of bias and prejudice of the
deputy sheriff summoning the jurors, a few of the per-
sons composing it were summoned on a second venire, is
no ground for challenge to the second panel, but the ob-
jections should be made to the individual jurors."

We hold, therefore, that the trial court did not err
in overruling the challenge to the panel of jurors served
by the special officer, and also that by reason of the fail-
ure of the defendant to object individually to the 18 men
who had previously been served by the sheriff on the
ground that they were disqualified to act, he has waived
the error, if any, occasioned by the trial judge permitting
the names of these men to be placed in the jury box. So
far as is disclosed by the record in this case, each of the
men who served upon the jury, out of the 18 complained
of, was accepted as an individual juror without further
objection by the defendant. Neither does the record show
that the defendant exhausted all of his peremptory chal-
lenges to individual jurors, or that he was required to
exercise a peremptory challenge to any of the jurors pre-
viously summoned by the sheriff. Under such circum-
stances this court cannot hold that a fair and impartial
jury was not afforded the defendant in the trial of this
case.

It is also contended that the court erred in refusing
to give instructions Nos. 2 and 3 requested by the de-
fendant, which are as follows:

2. "You are instructed that a conviction cannot be
had upon the testimony of accomplices unless they be

corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

3. "In this connection you are instructed that an accomplice is one whose connection with the commission of the crime is such that he could be indicted for the offense of which the accused is being tried."

If there is doubt as to whether, from the evidence, a witness is or is not an accomplice, then the trial court should define an accomplice and leave the determination of that fact to the jury, together with a proper instruction that the defendant cannot be convicted upon the uncorroborated testimony of an accomplice. In this case, however, it was not error for the trial court to refuse to give these requested instructions. We have carefully examined the evidence adduced both by witnesses on behalf of the state and by those for the defendant, and it nowhere appears that any of these witnesses for the state were accomplices under our statutes. The testimony shows that perhaps some were accessories after the fact, and were guilty of a separate and distinct offense from that for which the defendant was tried. Under our Code all persons who are concerned in the commission of a crime, whether they directly commit the act constituting the offense or aid and abet in its commission, though not present, are principals. Section 2104, Rev. Laws 1910.

"All persons who, after the commission of any felony, conceal or aid the offender, with knowledge that he has committed a felony, and with intent that he may avoid or escape from arrest, trial, conviction, or punishment, are accessories." (Section 2105, Rev. Laws 1910.)

There is no evidence in this record to the effect that any of the witnesses who testified for the state either aided, abetted, or encouraged the defendant to commit this crime, although some of them were present when the crime was committed, and after its commission aided and abetted the defendant in concealing the same. Had there been a question of doubt as to whether the evidence shows that these parties were or were not accomplices, then the court should have given the instructions requested, or proper ones along the same lines; but where the fact is not disputed, and there is no evidence to show that any witness for the state was an accomplice, there is no error in refusing to give an instruction upon the necessity of corroborating an accomplice.

It is also contended that the court erred in refusing to give the following instruction:

"You are instructed that if during the course of this trial any evidence has been offered which is capable of two constructions, one favorable to the defendant and one unfavorable, that it will be your duty to give to such evidence the construction most favorable to the defendant."

This instruction was properly refused because it invaded the province of the jury and tended to deprive the jury of the right to determine the weight of the evidence and the inferences properly to be drawn therefrom. In the case of *Dunn v. State,* 125 Wis. 181, 102 N. W. 935, the court said:

"The court was requested to instruct the jury: 'Where evidence is offered which is susceptible of two constructions, one of which tends to guilt and the other to innocence, it is the duty of the jury to adopt the latter.' We are satisfied that this request does not embody a correct rule for the guidance of the jury in considering the evidence before them. It would amount to a direction to the

jury that any evidentiary fact submitted to their consideration must be considered as tending to prove innocence if it can possibly be so construed. This would deprive juries of the right to give evidence the significance which they find and believe to be its natural and reasonable interpretation, in view of all the facts and surrounding circumstances of the case. The duty of interpreting evidence and drawing inferences therefrom in criminal trials is peculiarly within the province and the good judgment of the jury, and should not be infringed upon by artificial rules for determining its weight, and limiting the inferences they might reasonably draw therefrom."

See, also, *Kennedy v. State* (Ala.), 40 South. 658.

Counsel for appellant also contend that there was error by the trial court in admitting certain incompetent and irrelevant evidence, and in making certain remarks which are alleged to be prejudicial to the accused. There is embodied in the brief long excerpts from the testimony of several of the witnesses, but it is nowhere pointed out by counsel why the admission of this evidence was incompetent or irrelevant. No reasons are given why the trial court should have rejected the same, nor is it shown wherein the remarks of the trial court injured the accused. Counsel leave it up to this court to guess that the admission of this evidence was prejudicial, and that the remarks of the trial court were injurious. We have examined this entire record, read the evidence carefully, and given due consideration to all the remarks made by the trial court; we cannot say that there was error in this particular which would authorize this court to reverse this judgment.

This killing, according to the testimony of the state's witnesses, was as cold blooded, cruel, and malicious as any of which we have read. If there ever was a case deserv-

ing of the death penalty this is one. A defenseless man shot in the bed while asleep without warning, without opportunity to defend himself, or even to say good-bye, and then the defendant, after shooting him five times, and after reloading h.s pistol, returned to the bed because he was still alive, and put a final bullet into his brain, and then, after threatening the lives of those who were present, compelled some of them to dress the corpse and help load him onto a horse and conceal him in a deep ravine near the Arkansas river, where he was afterwards buried.

After a full and careful consideration of all the points urged by counsel for the appellant and assigned as reasons for a reversal of this judgment, we conclude that none of the errors complained of were of such a fundamental nature or so prejudicial as to deprive the accused of that fair and impartial trial which is guaranteed to him under the Constitution and laws of this state.

The judgment is therefore affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.