### EDWARD FLUKE v. STATE.

No. A-4153. Opinion Filed May 10, 1924.
Rehearing Denied June 12, 1924.
(226 Pac. 118.)

(Syllabus.)

1. **Jury—Jurors Need not be Summoned from Every Part of County—"Body of the County."** Our statutes, section 3521, Comp. St. 1921, provide that a special jury venire should be summoned from the body of the county.

   (a) "Body of the county" means the county at large, as distinguished from any particular place within it; a county considered as a territorial whole. But it is not necessary that the jurors should be summoned from every part of the county.

2. **Jury—Selection of Same Men after Discharge of Panel Improper—Defendant not Entitled to Complain of Irregularity.** Section 2665, Comp. St. 1921, in effect provides that a challenge may be taken to the panel where the officer who summoned the jury was interested or was a material witness in the case. If the sheriff either purposely or inadvertently assembled an unfair panel, which the court discharged for implied

bias, the immediate selection of the same men by another officer might in some instances operate to deprive the accused of an impartial jury.

(a) Despite such irregularity in assembling the second special venire, the defendant in this case cannot consistently complain, since the jurors actually called into the box were from the body of the county, and since he waived his objections by failing to exercise peremptory challenges.

3. **Instruction Criticized.** An instruction relating to circumstantial evidence, beginning with the following language, criticized: "Some of the evidence relied upon in this case by the state is what is known as circumstantial; when all of the evidence relied upon is circumstantial the law is."

4. **Parties to Offenses—That Other Unknown Persons Probably Participated not Inconsistent with Conviction on Circumstantial Evidence.** The fact that other persons unknown probably participated with the defendant in the commission of the crime is not inconsistent with a conviction resting on circumstantial evidence, because all who participated were principals and the circumstances shown were sufficient to sustain the verdict.

5. **Evidence—Testimony that it Would be Impossible for one Man to Place Dead Body on Described Straw Stack Inadmissible.** In a homicide case there was no error in refusing to permit the accused to show by the expert testimony of an undertaker that it would be impossible for one man to place a dead body on a certain described straw stack.

Appeal from District Court, Craig County; A. C. Brewster, Judge.

Edward Fluke was convicted of murder, and he appeals. Affirmed.

C. Caldwell and Hunt & Beauchamp, for plaintiff in error.

The Attorney General and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J.    Edward Fluke was by information filed in the district court of Craig county on May 2, 1921, charged with the crime of murder. On June 6, 1921, he was by verdict of a jury found guilty as charged, and on the 16th day of July, 1921, sentenced to serve a life term in the state penitentiary. From this judgment he appeals.

Edward Fluke was a half-blood Cherokee Indian, reared in the country east of Vinita, and was of good parentage and reputation. At the time of the trial he was about 23 years of age. In the fall of 1920 he sold his farming interests to his brother, and thereafter, part of the time, he made his home with his sister in Vinita, and part of the time stayed at his father's home, located in the country several miles from Vinita. He became acquainted with Harold Frye in Vinita, and they became good friends, being frequently in each other's company. Frye, at the time, was carrying mail between Vinita and Centralia and running a taxi at night.

On the morning of March 26, 1921, Frye failed to appear at his work, and on the 28th of March, when he was still missing, a search was started to find him. It was learned that Frye had taken two young men, named Jenkins and Hilderbrand, who were drinking, to a country dance on the night of the 25th of March; that after they returned Frye and the defendant met a train at 1:48 a. m. and took some girl friends in Frye's taxi to their rooms in Vinita, then went to a filling station; and that this was the last seen of Frye. The next day the defendant was riding about the streets of Vinita in Frye's car, and used it that night. He then took it to his father's home in the country, and on Monday following, March 28th, took it to a garage in Afton, where he left it and where it was found by the officers. He came from Afton to Vinita on the train, stayed all night at his sister's home, and then went to his home in the country the next morning.

Several days later the officers went to his home and found him there. He first said he had not had Frye's car; then told them where it was and took them to it. He was arrested and placed in jail in Vinita, where he told this story to the sheriff: That on the night of March 25th he

wanted to go out home to get some clothes and requested Frye to take him there; Frye told him that he had to take Jenkins and Hilderbrand to a dance and would take him after he came back; that after Frye came back they went in Frye's car to the Katy depot to meet the 1:48 train; that they met some girls there, took them to their rooms, then went to a garage and got some gasoline, then drove to a cafe in Vinita; there Frye got out of the car, and defendant went out home, got his clothes, and then returned to his sister's, where he stayed the rest of the night; that Frye was leaving Vinita, and they had agreed to meet in Kansas City at the Union depot the next Monday; that the last he saw of Frye was when he left him at the cafe in Vinita; that it rained on Sunday, and on account of the storm defendant did not go to Kansas City, as arranged with Frye. He made no explanation as to why he did not go to Kansas City to meet Frye later. Parts of this statement of defendant were corroborated by the witnesses for the state, but the state's evidence indicated that other portions of it were a fabrication.

The search for Frye was renewed, and some days later his body was found in a burned straw stack on the Grove-Afton road, about nine miles east of Vinita and about a mile from the home of the defendant. The straw stack was the straw from a 40-acre field of wheat, and was about 15 feet high, fairly regular in shape, and at least 30 feet in diameter near the bottom. It stood about 200 yards south of the road, in a wheat field, and was burned to the ground. Farmers in that vicinity had seen it burning early in the morning, about daylight, of the 26th of March, but heard no shot or disturbance. The body was in the center of the burned stack, lying on the left side. It was badly burned and decomposed. The body was identified by a number of witnesses as being that of Harold Frye. Some of the clothing was not

entirely burned, and some papers in a coat pocket were not totally destroyed. From the clothing and tailoring marks thereon and the papers found the jury were convinced that the body was that of Frye. The left arm of the body was broken and a 25-caliber bullet was found in the brain, fitting the gun and like the bullets recently purchased by the defendant under an assumed name. The 25-caliber automatic gun so purchased was found in defendant's mackinaw coat hanging in the kitchen of his sister's home after defendant had been lodged in jail.

The evidence on the part of the state showed that some of the statements of defendant to the sheriff concerning his movements and associations with Frye on the fateful night were true; but his explanation of the possession of the car and his purchase, ownership, and disposition of the gun was unsatisfactory.

Several witnesses who knew defendant testified that he was a young man of good reputation. The evidence sustaining the conviction was wholly circumstantial. Proof of the identity of the body of deceased and the manner of the killing was circumstantial. Defendant's explanation to the sheriff of his possession of Frye's car, standing alone, might be true and consistent with his innocence; but, when considered along with the many other unrefuted circumstances, the whole constituted a convincing and consistent chain of circumstances indicative of guilt, so that the jury were justified in concluding that this explanation was in part fabricated. The fact that the body of Frye was placed upon the top of a straw stack 30 feet in diameter and 15 feet high, with its sides near the base perpendicular, thence sloping towards the apex—so that one man, unassisted, could not have so placed a dead body—indicated that the accused, if guilty, must have been assisted by others; but the fact that others

unknown were probably implicated in the commission of the offense did not weaken the force of the evidence pointing to defendant's guilt.

On the whole, the numerous facts constituting the chain of circumstances were remarkably consistent with each other and inconsistent with the innocence of the accused and of such convincing character as to be of equal force to prove guilt as direct evidence.

Defendant claims that the evidence is insufficient to sustain the verdict; that the record is full of prejudicial errors; and that he did not have a fair and impartial trial.

The record is voluminous, containing more than 1,100 typewritten pages. The petition in error sets forth 54 assignments of error, but only such of these as are deemed essential to a proper disposition of the appeal will be treated in this opinion.

The mystery surrounding this murder and its gruesome details had a natural tendency to arouse the ire and passions of the community, so as to make it difficult to procure an unbiased jury. In doing this the regular panel in attendance was exhausted, and it became apparent that to complete the jury other prospective jurors would have to be summoned. Accordingly, the court ordered the sheriff to summon a special venire of 30 jurors from the body of the county to serve as jurors in this case. It is claimed by defendant that the 33 jurors summoned by the sheriff, pursuant to this order of the court, all, or nearly all, resided in and near Vinita.

When the court's attention was called to the fact that the sheriff was an important and material witness for the state, the special panel which he had summoned upon order of the court was discharged. Thereupon a bystander, A. C.

Peace, was commissioned and sworn as a special officer to summon special jurors in lieu of those just discharged. This special officer then resummoned nine of the men that had just been discharged, together with others not known to the defendant. Defendant then asked that this second special panel be discharged for the reason that the panel was largely composed of those illegally assembled to serve in the first special panel, asserting that the special officer was biased and knew that several of the jurors summoned by him had been previously selected by the sheriff and discharged by the court, and that the men last summoned "all lived within the city of Vinita, and that there is considerable prejudice and feeling against this defendant in said city," and that on that account the jurors so selected could not render an impartial verdict.

Upon this motion proof was heard, in which the special officer admitted that he knew at the time of service that some of the jurors had been assembled and discharged, as before related. There was no denial that these jurors were summoned in Vinita and no testimony offered as to the residence of the persons summoned. From other parts of the record it appears that most of them resided in Vinita. The court found that this special officer was without bias, and that the panel last summoned was regular. Thereafter the parties were ordered to complete the selection of jurors from among those last summoned, which was accordingly done. Other portions of the record show that the defendant did not exercise all of his peremptory challenges, and that he challenged none of those who were adjudged qualified on the special venire.

The court committed no error in refusing to direct the officer to summon persons whose names were on the regular jury list. Our statutes, section 3521, Comp. Stat. 1921, pro-

vide for a special jury panel under circumstances such as these. Under such exigencies, this statute makes an exception to the general rule, permitting the summoning of a special panel of persons whose names might not be found on the regular jury list. This is for the purpose of expediting the trial in progress, but this statutory exception also provides that the jurors are to be selected "from the body of the county."

"Body of the county" means the county at large, as distinguished from any particular place within it; a county considered as a territorial whole. Black's Law Dict. (2d Ed.) 141; Cyclopedic Law Dict. (2d Ed.) 113; City of Chicago v. Knobel, 232 Ill. 112, 83 N. E. 459. Anderson's Law Dictionary, pp. 217, 271, defines the term "body of the county" as the territorial limits of a county; the people of a county collectively considered; the "body of a county" is its territorial entirety, as distinguished from a portion of the territory. The term "body of the county," in an Iowa statute providing that where the persons summoned to serve as jurors fail to appear, or where the court decides that they have been illegally called or drawn, the court may set aside the precept under which they were summoned and cause a precept to be issued to summon a sufficient number from the body of the county, means from the county at large, but not necessarily that the jurors should be summoned from every township in the county. I Words & Phrases, First Series, 819; State v. Arthur, 39 Iowa, 631; State v. Bolln, 10 Wyo. 439, 70 Pac. 1. The term "body of the county" is a generic term applied to the representation of the citizens of the vicinage embodied in the list of qualified jurors selected by officers appointed by law; it does not require absolutely perfect representation of the entire county. People v. Dunn, 31 App. Div. 139, 52 N. Y. Supp. 968.

Manifestly, a defendant on trial for his life in a prosecution predicated on evidence purely circumstantial, in a community where the passions of the people have been aroused by the atrocity of the crime charged, has a right to all the statutory safeguards designed to secure an impartial jury. Under such circumstances, both the letter and the spirit of the law providing safeguards against unfairness should be followed. This jury was not selected from the "body of the county," as contemplated by statute. We do not mean to hold that a "pick-up" jury selected from among the residents of the county seat would be unfair in every case, but believe that under the circumstances here a selection of a special panel in the manner shown by the record would ordinarily be unfair to the defendant. In this instance it proved harmless, as will later appear.

Section 2665, Comp. Stat. 1921, in effect provides that a challenge may be taken to the panel where the officer who selected them was interested or was a material witness in the case. The law-makers did not contemplate that because the sheriff was a material witness he would consciously or unconsciously make an unfair selection, but they did make the provision to guard against a possible "hand-picked" jury. This possibility was still present when a disqualified sheriff had selected and assembled a jury panel, which was by the court discharged, and then a special officer, however impartial, immediately selected many of the same men on a second panel. If the sheriff purposely or inadvertently assembled an unfair panel, the selection of the same men by another officer would in some instances operate to defendant's hurt.

This holding is not in conflict with the declarations of the court in the case of Hisaw v. State, 13 Okla. Cr. 484, 165 Pac. 636. In the Hisaw Case it was held that after a

challenge to a special panel had been sustained, the fact that some of the persons so summoned and discharged were summoned on a second venire by an unbiased officer is no ground for challenge to the second panel. The Hisaw Case differs from the case here in that the special officer was selected by agreement of parties and was instructed by the court in what manner he should select the jurors; and the persons he selected in town were for the most part farmers who lived in various parts of the county and whom he met upon the streets and around the court house; in addition to these, he went out over the county and summoned twelve more qualified men. The special officer in that case had no knowledge that any of the persons he summoned had been previously summoned and discharged.

After the special venire had qualified both the state and the defendant rapidly waived their remaining peremptory challenges, and but three jurors were selected from this special venire, two of whom resided in distant parts of the county. None of these were challenged peremptorily, so it appears that despite the irregularity in qualifying the special venire, the defendant cannot consistently complain because he waived such right by failing to exercise his peremptory challenges as against every juror so selected.

The defendant strenuously urges that the introductory paragraph of instruction No. 6 given by the court is a misstatement of law and fact, to his prejudice. This instruction related to circumstantial evidence, and the part complained of is as follows:

"Some of the evidence relied upon in this case by the state is what is known as circumstantial; when all of the evidence relied upon is circumstantial the law is," etc.

Defendant says that this is misleading, being in effect a finding of fact by the court that some of the material facts

indicative of the guilt of defendant were proved by direct evidence, and that therefore the jury would be justified in disregarding the rest of the instruction which correctly stated the law relating to circumstantial evidence, for the reason that the court in effect stated that the rule relating to circumstantial evidence need not apply where only some of the evidence was circumstantial.

We think there is some foundation for criticism of this instruction. However, the jury heard the testimony and without question knew that all of the vital parts of the testimony pointing toward the guilt of the defendant were circumstantial. True, evidence as to the circumstances was direct, but there was no witness who claimed to have seen any part of the tragedy; there was none who heard any shooting or other noise connected with it; all the evidence of the killing was in the common acceptation of the term purely circumstantial. The jury must have known that no instruction upon circumstantial evidence would be necessary or would be given by the court unless the evidence warranted such an instruction. The circumstances indicative of guilt, tested by the rule stated in this instruction, were so numerous and convincing that the jury were justified in bringing in the verdict as recorded. While it appears that other unknown persons probably participated in the commission of the crime, the conclusion is irresistible that the defendant was implicated in the crime and was therefore a principal.

There was no error in the exclusion of proffered expert testimony by an undertaker tending to show that it would be impossible for one man to place a dead body on this straw stack. An opinion of an undertaker on that point would be of no greater probative value than that of a farmer testifying concerning a bag of wheat or any other

heavy inert substance. As to this class of so-called "expert testimony," see 22 Corpus Juris, Opinion Evidence.

We have examined the various objections to the introduction of alleged incompetent testimony and the exclusion of other testimony offered by the defendant. It would prolong this opinion to too great length to analyze the various parts of the evidence said to have been erroneously admitted or excluded. It is sufficient to say that none of these alleged errors are of sufficient importance to disturb the verdict.

The judgment of the trial court is therefore affirmed.

MATSON, P. J., and DOYLE, J., concur.