## J. D. GREENWOOD v. STATE.

No. A-7432. Opinion Filed May 2, 1931.
Rehearing Denied May 29, 1931.
(299 Pac. 248.)

W. H. Brown, Joseph W. Foster, Fred H. Fannin, and J. P. Roberts, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., (Ben W. Belew, Co. Atty., of counsel), for the State.

EDWARDS, J. The plaintiff in error, hereinafter called defendant, was convicted in the district court of Haskell county of manslaughter in the first degree, and was sentenced to serve a term of 25 years in the state penitentiary.

The record discloses that defendant and his son, Orville Greenwood, lived near the town of Keota, and near them lived Sam McCann, Henry McCann, A. W. Piatt, their stepfather, and T. A. Lowe, a friend of the McCanns. Sam McCann bore an unenviable reputation as being of a domineering disposition and a lawbreaker. The reputation of Henry McCann was attacked to some extent. The defendant and his son appeared to have borne an excellent reputation. A short time before the tragedy, which is the basis of this prosecution, Orville had ridden a horse

to where Sam McCann was, and, according to defendant's evidence, Sam McCann had taken the horse from Orville at the point of a gun and had ridden it away. Orville reported the matter to defendant, and a complaint charging Sam McCann with the theft of the horse had been filed before a justice of the peace at Keota. On the day of the tragedy a preliminary hearing was had, which resulted in the discharging of McCann at the conclusion of the state's evidence. In attending the trial, defendant and his son each carried a loaded pistol which they deposited in a drug store. After the conclusion of the trial and the discharge of McCann, they went back to the drug store and got their pistols. They came out of the drug store, and, as they were passing the store adjoining, Sam McCann started into the store, and Orville Greenwood made two or three steps toward him, but did nothing further; that defendant said to him: "You were too slow." Defendant and his son then walked down the street, while Sam McCann went into the store where his mother was and took his small son to the back of the store and gave him a drink of water and then left the store with the others to return home. The witnesses for the state testify that, as Sam McCann passed the Greenwoods opposite the stairway leading to the courtroom defendant said to Orville: "Shoot him! Shoot him!" Orville drew his pistol and shot Sam McCann in the back, and McCann ran up the stairway; Orville followed, shooting him about four times, and McCann fell down the steps to the foot of the stairs. T. A. (Jud) Lowe was standing near the foot, and seized Orville Greenwood around the waist, for the purpose, as he says, of preventing his shooting McCann. Defendant stepped up and shot Lowe in the face and head, and Lowe fell to the sidewalk, pretending to be dead. Defendant and his son next turned to the east and Henry McCann was standing near the bank building about

20 feet away. Defendant fired at him, and Henry Mc-Cann ran behind a post in front of the bank and dodged behind a couple of bystanders and begged defendant not to shoot him, but despite this defendant reached over the shoulders of some bystanders and shot him in the back about four times, killing him instantly. At about this time Dick Piatt, stepfather of McCann, seized the pistol in Orville's hands, and in the struggle over the pistol it fell to the ground, and about this time defendant shot at Piatt, but missed him, and Orville recovered his pistol and shot Piatt in the arm. Piatt fell, and defendant shot at him again, and then snapped his pistol at him. It appears that neither of the McCanns nor Lowe nor Piatt were armed. This case is a prosecution for the killing of Henry McCann. The record is voluminous. All the eye-witnesses to the homicide except defendant and his son testified for the state. One was a relative of defendant.

The theory of the state is that the killing of Henry McCann was the result of a conspiracy between defendant and his son. Defendant contends the killing of Sam McCann by Orville Greenwood was in self-defense, and the shooting of Lowe by defendant was in defense of his son; that, when he saw Henry McCann, he had his hand under the bib of his overalls, coming toward defendant, and he believed he was going to shoot him, and the first two shots he fired at Henry McCann were also in self-defense. Further, that he believed Sam McCann and Lowe were acting together in an assault upon Orville Greenwood. Defendant testified he had no recognition of the last shots fired at Henry McCann; thus presenting the further defense of insanity. The instructions of the court cover both the law of self-defense and insanity. Both the state and the defendant were represented by very able counsel. The case was closely tried, and is well briefed.

Numerous assignments of error are argued. The first contention is that the court committed error in overruling the motion to quash a special jury venire, particularly as to 20 names included therein of jurors called in a previous special venire which had been quashed, citing Shuford v. State, 4 Okla. Cr. 513, 113 Pac. 211; Hisaw v. State, 13 Okla. Cr. 484, 165 Pac. 636; Combs v. Slaughter, Hardin (3 Ky.) 67. The sheriff was a witness; the court appointed a special officer to serve a special venire for 30 persons to act as jurors. The special officer appointed to serve did not take an oath of office before serving this first special venire. On motion, the court quashed this first special venire, reappointed the special officer, who then took the oath, and he was directed to serve another open venire for 30 persons to serve as jurors. The special officer did this, but in the second venire served were 20 persons who had been summoned by the first special venire. The motion to quash the first special venire was sustained because the special officer had neglected to take an oath of office. He was, however, a de facto officer. State v. Hudson et al., 44 Okla. Cr. 1, 279 Pac. 921; Rosell v. Board of Education, etc., 68 N. J. Law, 498, 53 A. 398. It would not have been error for the trial judge to have overruled the motion to quash the first special venire. Under the circumstances, the including of some of the jurors discharged under the first venire was not error.

Complaint is next made that the state was permitted to introduce incompetent and immaterial evidence, prejudicial to defendant. This assignment is directed to various items of evidence. It is pointed out that a state's witness, Smith, an eyewitness who had testified he had no acquaintance with the participants in the tragedy, was permitted to answer on redirect that his son and the Greenwood boy were good friends. Another complaint

under this assignment is directed to the cross-examination of defendant's witness Harding, who had testified that Sam McCann, about a month before the tragedy, on the occasion of his arrest on a whisky charge, had made a threat against defendant. On cross-examination it was drawn out that McCann was released on that charge. Another item is that the state's witness Lowe was permitted to give hearsay testimony. Another, that defendant was required to answer on cross-examination of the taking together of a picture of one of the sons of defendant and a niece of deceased, and the introducing of the picture in evidence. Another, is the testimony of this niece of deceased in reference to the picture referred to and of the friendly relations of this witness to the family of defendant. Also that the state was permitted to show that, when Sam McCann went into the store, just before the homicide, he made some statement to his mother or some members of his party. Defendant contends this was hearsay, and constitutes reversible error, citing Brokhaus v. State, 11 Okla. Cr. 625, 150 Pac. 510; Graham v. State, 28 Okla. Cr. 266, 230 Pac. 763. The statement made by McCann to his mother or member of his party had no reference to the difficulty; it was merely in reference to the child, and to inquire if they were ready to go home. The admission of hearsay evidence such as this is not ground for reversal, since it is obvious that it could not prejudice or injure defendant. 17 C. J. p. 332, § 3675; Starr v. State, 7 Okla. Cr. 574, 124 Pac. 1109. There are some other items under this assignment which we deem it unnecessary to enumerate. As a general rule, the examination of witnesses is a matter that rests largely in the discretion of the trial court, and this court will not disturb a conviction on account of a liberal examination, unless it is apparent that the trial court abused its discretion in this respect. Barrow v. State, 17 Okla. Cr. 340, 188 Pac. 351, 9 A. L. R. 207.

Some of this evidence has no particular significance, but we fail to see how it could have injured defendant.

Objections are urged to several questions as leading, suggestive, and argumentative. One of these is directed to the testimony of Dr. Carson as to whether the wound which caused death was larger in the front or back of the body. Another is to the line of questions asked witness Jamison as to the action of Orville when Sam McCann passed him just before the shooting and of the statement by defendant that Orville was "too slow"; questions to the witnesses Tripp and Smith, who were eyewitnesses called by the state; questions to the witness Wallen and the witness Martindale as to the statements of defendant relative to the dangerous character of the McCanns, made long prior to the homicide. Some of these questions are rather leading in directing the attention of the witness to the particular matter sought to be elicited. The questions, however, were all concerning competent matters. We cannot say there was any abuse of discretion by the trial court prejudicial to defendant. The rule is liberal that the examination of witnesses is a matter largely in the discretion of the trial court.

It is also urged that the county attorney was guilty of misconduct in attempting to get to the minds of the jury that Henry McCann bore a reputation of being a quiet, peaceful, and law-abiding citizen, when his reputation had not been attacked by defendant. In one instance the county attorney asked the witness Brice, if he knew the reputation of Henry McCann for being a quiet, peaceful, and officious (sic) man. An objection was sustained, and counsel said: "We just wanted to get it before the jury." On a motion to strike, the county attorney said: "I will withdraw the remark and apologize and ask the jury myself not to consider it." The court then instructed the

jury to disregard the remark. Further on the county attorney asked a witness on cross-examination if he knew of Henry McCann being in any trouble of a violent nature. The question was objected to, and was not answered. Other witnesses were asked if they knew Henry McCann, but no question as to his reputation was asked. This court has in the case of Coulson v. State, 48 Okla. Cr. 206, 291 Pac. 152, held that the evidence of the good reputation of the deceased was not admissible, unless put in issue by the defendant. The record does not disclose that defendant offered the testimony of any witness as to the character or reputation of Henry McCann, but in the opening statement of defendant's counsel to the jury it was said:

"* * * The proof will show that Henry made whisky, that he was a professional manufacturer of liquor and that Sam sold it for him, and Henry and Mr. Piatt and Dick Piatt backed Sam up in all the things that he did, and there will be proof to show that they didn't do anything that an honest upright citizen ought to do. * * * The proof will show that Sampson McCann encouraged and backed up by Henry McCann and his mother, that he harrassed and tormented and annoyed this man Greenwood upon every opportunity he could get from time to time. * * * They were continually offending him and Sampson McCann was the ring leader and Henry was backing it up. * * * The proof will show that the McCanns came over there drunk and raised a controversy with one of his tenants and when he told him he didn't want men on his premises drunk and interfering with his men, that made him mad. He held that against him. * * * I want to tell you, gentlemen of the jury, when this proof is in you will be convinced beyond a shadow of a doubt that this country for miles around was terrorized for miles and Henry come right along with him too. Henry McCann wasn't as open and boisterous as Sampson was. * * * Now, then Greenwood had heard of these threats and Greenwood

knew the McCanns had the reputation of being a man who bore a bad reputation as a law-abiding citizen. * * *"

Where counsel in this manner place before the jury the reputation of a deceased, the rule of exclusion will not apply with that strictness as in a case where the question of reputation is raised solely by the state. It would be manifestly unfair to permit a defendant to suggest to the jury in this manner a bad reputation of deceased, then for the court to hold it reversible if the state should attempt to rebut such assertions. Since reputation was first raised by defendant in the opening statement of his counsel, and since the objection was sustained by the court and the evidence withdrawn, the proceeding does not constitute reversible error.

Next it is argued the court erred in refusing to allow defendant to testify he knew Lowe to have a general reputation as being a dangerous and overbearing person. The killing of Sam McCann, the shooting of Jud Lowe and Dick Piatt, and the killing of Henry McCann, all may be said to have had a common origin. This evidence should have been admitted. The exclusion of the evidence, however, could have had no particular influence in the trial of the case, for the reason that at the time defendant shot Henry McCann he had already seen Sam McCann shot and killed by his son Orville; he had already shot down Jud Lowe, and, leaving him apparently dead, had turned his back on him and his attention to Henry McCann, who was several steps away, had pursued and shot him in the back, and had even fired a shot into his prostrate body as he lay on the ground. Defendant says he fired the first two shots at Henry McCann because he believed McCann was about to attack him. The character and reputation of Jud Lowe could not have influenced his action, and could not have affected the verdict of the jury.

We are pressed with the argument that there was prejudicial error in the cross-examination by the county attorney of defendant's witnesses who testified to the mental condition of defendant and in the questions propounded state's witnesses as to his mental condition; that an hypothetical question touching defendant's mental condition at the time of the homicide was propounded by his counsel, and also in cross-examination the county attorney selected certain facts and asked if these particular facts indicated insanity, or in some instances a "delusion" or "insane delusion" or otherwise; that he did not include all the main or essential facts in his question. Further, that he examined medical witnesses called by the state in rebuttal touching defendant's mental condition by asking questions which failed to include and fairly state the evidence in the case, citing Ryan v. People, 60 Colo. 425, 153 Pac. 756, L. R. A. 1917F, 646, Ann. Cas. 1917C, 605; State v. Garrison, 59 Or. 440, 117 Pac. 657; Brown v. State, 9 Okla. Cr. 382, 132 Pac. 359; Davis v. State, 15 Okla. Cr. 386, 177 Pac. 621. These cases support the claim that permitting the prosecution to cross-examine an expert witness as to the various instances given by the expert as an evidence of insanity is subject to criticism, since the mental capacity of a party is not demonstrated by a single fact or occurrence, but depends upon a long course of behavior and mental phenomena. Also that the hypothetical question propounded an expert should include the "essential undisputed facts" or "all the facts essential to some theory."

The term "insane delusions" and the term "insanity" appear to have been used by counsel for the state as synonymous. Dr. Strange, expert witness for defendant, stated in his direct examination that in his opinion defendant was suffering with "delusional insanity," and the

state's counsel apparently considered delusions as being insanity exempting defendant from criminal responsibility.

There has been in recent years considerable criticism of the testimony of experts in cases in which insanity is pleaded as a defense to criminal prosecutions, particularly to the use of the hypothetical question. A recent work has said:

"There is no valid reason for not permitting the expert to express his opinion directly, since everyone in the courtroom knows that the hypothetical monstrosity, whose mental condition the expert is asked to pass upon, is the defendant; and it is impossible, psychologically, for the jury or the expert, answering the hypothetical question about the assumed person, not to be influenced by this knowledge." Glueck, Mental Disorders and the Criminal Law, p. 29; White, Insanity in the Criminal Law, p. 81.

Further it is said that the most serious indictment of the modern practice as to expert testimony in insanity trials is that it places the experts in a partisan position, reducing the whole procedure to a battle of wits, supported by large fees, and results in bias and prejudice on the part of opposing experts. Chief Justice Chapman, of the Massachusetts Supreme Court, is quoted as saying:

"Experts can be found to testify to any theory, however absurd."

The reform may be long in coming, but it seems to us that, in the interest of expediency and justice, qualified experts not employed by the state nor accused should be called by the court and should be permitted to testify directly an opinion as to the defendant's mental condition, giving the grounds for the opinion, and making same clear to the jury. This would eliminate the element of bias and the partisan nature of expert medical testimony, and

would render substantial justice to an accused and to society. Oppenheimer, "Criminal Responsibility of Lunatics," p. 266. Some of the examination and cross-examination in the instant case are not in close conformity to approved procedure in so far as it relates to the hypothetical question and the cross-examination, but we are clearly of the opinion that the departure, if error, resulted in no prejudice to defendant.

It is contended that the court erred in refusing defendant's requested instructions and in several of the instructions given. No. 9 is challenged. This instruction tells the jury what facts must be found in order to warrant a conviction, and concludes that, if the state of facts enumerated is found beyond a reasonable doubt, the jury should convict, unless they believe the acts were committed under such circumstances as to constitute justifiable homicide. The objection is that this instruction omits the plea of insanity. It is not essential that all the law should be stated in a particular instruction. The law as to insanity is covered by other charges of the court, and the jury are told they must consider and construe the instructions as a single charge. As to No. 11, on self-defense, it is contended this is erroneous as not covering the right of defendant to protect his son, but using the term "and his son" instead of "or his son." The instruction uses the term "to protect himself and his son or either of them. * * *" Nos. 15 and 18 are claimed erroneous in raising the question as to who was the aggressor, and in stating that, if defendant was the aggressor, he could not claim self-defense. This objection also goes to Nos. 16, 17, 18, and 21. Under the respective theories of the state and the defendant, the question as to who was the aggressor became a material issue, and the instructions upon this point, considered together, are free from material error. The

correctness of Nos. 22, 24, 25, and 27 touching the question of insanity and the application and restriction of evidence as to sanity or insanity is contested. Without setting out the instructions or entering into any extended discussion, we are thoroughly satisfied these instructions are substantially correct. No. 20, a somewhat lengthy instruction, contains this paragraph:

"Under his plea of not guilty the defendant has a right to offer as many defenses as he sees fit, whether such defenses are consistent or inconsistent, and the fact that he may interpose inconsistent defenses raises no presumption against him by reason of any apparent inconsistency."

This, defendant insists, is extremely prejudicial as suggesting to the jury that the plea of insanity is inconsistent with the plea of self-defense, citing State v. Porter, 213 Mo. 43, 111 S. W. 529, 127 Am. St. Rep. 589; State v. Wade, 161 Mo. 441, 61 S. W. 800. This particular paragraph might well have been omitted. However, it does not criticize either defense or suggest that either is false, but attempts to tell the jury the right of defendant to offer as many defenses as he may see fit. There may be no legal inconsistency between the plea of self-defense and the plea of insanity, yet to the lay mind there is an inconsistency. The plea of self-defense suggests an act done, based upon reason, under an apprehension of danger. The plea of insanity suggests an act done without reason or without the ability of the person committing it to know right from wrong at the time, or to know the nature and consequences of the act. As a matter of law, certainly an insane person has the same right of self-defense as a sane person. The particular paragraph objected to really amounts to a caution to the jury not to permit an apparent inconsistency to militate against defendant. The instructions, while not technically correct in every partic-

ular, are not prejudicially erroneous. West v. State, 13 Okla. Cr. 312, 164 Pac. 327, L. R. A. 1917E, 1129; Brister v. State, 35 Okla. Cr. 319, 250 Pac. 442.

There are other objections to various instructions and upon other points which we do not enumerate; they have not been overlooked, but have had the consideration of the court. As is to be expected in a trial of this nature, sharply contested, with many witnesses and involving nice points as to the admissibility of evidence and other numerous questions of law, the rulings of the trial court made during the heat of the trial would not in all instances meet the full approval of an appellate court, with ample time to investigate, weigh, and consider the issues raised. We are impressed, however, that the trial judge earnestly sought to try the case fairly. The charge of the court, considered and construed together, we are satisfied, correctly states the law applicable to the facts in the case as favorably to defendant as the evidence warrants. The jury must have been impressed from the evidence that the killing of Henry McCann was wholly unprovoked and unnecessary. They must have given considerable weight to the testimony of good character of defendant in reducing the finding of guilt from murder to manslaughter. Defendant had a fair trial. The evidence fully sustains the verdict, and no reason appears why this court should interfere with the judgment.

The case is affirmed.

DAVENPORT, P. J., and CHAPPELL, J., concur.